**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CHANNON ROSELYNNE FRANCO,
Individually, EFRAIN CHANNON FRANCO,
Individually, EFRAIN TRUJILLO FRANCO,
Individually, EFRAIN TRUJILLO FRANCO,
as Parent and Next Friend of E.C.F., a minor
child; EFRAIN TRUJILLO FRANCO, as Parent
and Next Friend of E.F., a minor child; EFRAIN
TRUJILLO FRANCO, as Parent and Next
Friend of E.C.F., a minor child; EFRAIN
TRUJILLO FRANCO, as Parent and Next
Friend of M.R.F., a minor child;

      Plaintiffs,

     v.                                                    Civ. No. 23-668 SCY/LF

ROSS DAUGHERTY, JEREMY SANCHEZ,
CARLOS CROSBY, JORDAN SKINNER, and
TROY BARNES, Employees of Bernalillo
County,

      Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN
PART MOTION FOR QUALIFIED IMMUNITY**

      Plaintiffs were living in the backyard of a property at 4821 Isleta Blvd. SW on August 13,

2020, when Defendants Bernalillo County code enforcement and sheriff's deputies entered the

backyard of the property via the side gate to perform a safety sweep prior to a code inspection.

They did not have a warrant. When Defendants encountered Plaintiff Channon Roselynne

Franco, Defendant Jeremy Sanchez briefly detained her and performed a sweep of the trailer and

of a structure located next to the trailer. He observed children inside the structure living in dirty

conditions. Defendants left the property when Ms. Franco asked them to leave. Another deputy

contacted Bernalillo County Sheriff's Office Safe Child Unit. Defendant Ross Daugherty

responded to the call. He observed that Ms. Franco had locked the side gate leading to the back

of the property. Deputy Sanchez cut the lock on the gate so that police could open the gate, enter the property, and perform a search of the property to determine the welfare of the children. After this search, Daugherty arrested Mr. and Ms. Franco for child abuse by endangerment and interference with a child welfare investigation.

The Court finds that Defendants have failed to show undisputed facts to demonstrate Plaintiffs lack a legitimate expectation of privacy (standing) to contest the searches and seizures. As for Plaintiffs' assertions of constitutional violations, the Court finds that Defendants violated clearly established law by conducting a warrantless search in the absence of consent or exigent circumstances. The Court also finds no arguable probable cause supported the arrests of the Francos. Therefore, as to the majority of Plaintiffs' Fourth Amendment claims, the Court denies Defendants' motion for qualified immunity with regard to the Defendants involved in these illegal searches and seizures. Because Plaintiffs fail to meet their burden to overcome qualified immunity on their First Amendment claim, however, the Court grants Defendant Daugherty summary judgment on Plaintiffs' First Amendment claim.

## STANDARD OF REVIEW

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing

a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

    B.    Qualified immunity

    Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When an individual defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The plaintiff must show that 1) the officer violated a constitutional or statutory right and 2) the right was clearly established when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). A court may address these prongs in either order, *Pearson*, 555 U.S. at 236, but a plaintiff must satisfy both to avoid qualified immunity, *Olsen*, 312 F.3d at 1304.

    In determining whether an officer is entitled to qualified immunity, the relevant question is not whether the officer made a mistake or whether, in retrospect, the officer should have acted differently. "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—

should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Instead, the relevant inquiry is whether an officer had clear notice that the specific conduct in which the officer engaged was illegal.

A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. The action at issue need not have been previously declared unlawful, but its unlawfulness must be evident in light of preexisting law. *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). Except for egregious circumstances in which every reasonable officer would understand the conduct at issue to be unreasonable, unlawfulness is generally demonstrated "when there is controlling authority on point or when the clearly established weight of authority from other courts supports plaintiff's interpretation of the law." *Id.* at 1069-70 (internal quotation marks omitted). "A prior case need not have identical facts," *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017), but the precedent must make it clear "to every reasonable officer . . . that what he is doing violates that right," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). The plaintiff bears the burden of identifying "a controlling case or robust consensus of cases" where an officer acting "under similar circumstances" to those faced by the defendants was found to have acted unlawfully. *D.C. v. Wesby*, 538 U.S. 48, 65 (2018); *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015). Furthermore, the cases so cited must clearly establish that "the scope of the right encompasses the facts presented." *Quinn*, 780 F.3d at 1012 (internal quotation marks omitted; emphasis removed). "[T]he defense of qualified immunity gives public officials the benefit of legal doubts." *Donovan v. City of Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994) (internal quotation marks omitted). Thus, qualified immunity provides "ample room for mistaken judgments . . . ." *Malley v. Briggs*, 475 U.S. 335, 314, 343 (1986).

## PROCEDURAL HISTORY

Plaintiffs consist of Channon Roselynne Franco ("Ms. Franco") and Efrain Trujillo Franco ("Mr. Franco"), the parents of children Efrain Channon Franco (their adult son) and E.C.F., E.F., E.C.F., and M.R.F (their minor children). Doc. 1 (Compl.) ¶¶ 1-4. Defendant Crosby is employed as a Bernalillo County code enforcement officer. Compl. ¶ 5. Defendants Ross Daugherty, Jeremy Sanchez, Carlos Crosby, Jordan Skinner, and Troy Barnes are Bernalillo County sheriff's deputies. Compl. ¶ 5.[1]

Plaintiffs filed this suit in federal court on August 11, 2023. Their complaint brings three causes of action: Seizure Without Reasonable Suspicion, Arrest Without Probable Cause And Charging Without Probable Cause In Violation Of The Fourth Amendment To The United States Constitution (Count I); Violation Of Property Rights And Unreasonable Search Of Plaintiffs' Home Contrary To The United States Constitution (Count II); and Violation Of First Amendment Right To Familial Association (Count III). Defendants have filed a motion for summary judgment asserting qualified immunity on all counts.

## UNDISPUTED MATERIAL FACTS

A.    Procedural rulings

The Court considers Defendants' statement of undisputed material facts (Doc. 43 at 3-10, hereinafter "UMF"), Plaintiffs' response to those facts (Doc. 48 at 9-14), and, where relevant and non-duplicative, Plaintiff's additional material facts (Doc. 48 at 2-8). Where Plaintiffs deny an UMF Defendants have asserted but do not cite record evidence to controvert that fact, the Court will consider the UMF undisputed. D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer

---

[1] In general, the Court refers to individuals by their last name. Because Channon Franco and Efrain Franco share a last name, however, the Court refers to them as Ms. Franco and Mr. Franco.

with particularity to those portions of the record upon which the non-movant relies . . . . All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted."); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 856 (10th Cir. 1999) (affirming a grant of summary judgment based on deemed-admitted facts, where the non-movants did not "comply with the requirement that they specifically controvert the defendants' fact statements with adequate and accurate record support"). Where Plaintiffs offer facts supported by record evidence that are material to the Court's decision, the Court discusses them below. The Court will view the facts in the light most favorable to the Plaintiffs and will draw all reasonable inferences in Plaintiffs' favor.

   B.    Zoning investigation at 4821 Isleta Blvd. SW

   Defendant Carlos Crosby is employed as a code enforcement officer for Bernalillo County, and Defendants Ross Daugherty, Jeremy Sanchez, Jordan Skinner, and Troy Barnes are deputies with the Bernalillo County Sheriff's Office. UMF 1. On August 13, 2020, just after noon, Crosby reported to 4821 Isleta Blvd. SW in Albuquerque, New Mexico 87105 to investigate reports of zoning code violations. UMFs 2-4.[2] For safety reasons, sheriff's deputies accompany code inspectors during their inspections. UMF 14.

   Crosby had been notified by County Animal Care regarding calls and concerns about unsafe conditions, smells of sewage, and the presence of animals on the property. UMFs 5-6. Crosby was also informed by Animal Care that there were people and kids on the property. UMF

---

[2] Plaintiffs purport to dispute these facts, Doc. 48 at 9, but Defendants' facts are taken word-for-word from Plaintiffs' complaint. *See* Doc. 1 ¶¶ 6, 11, 12. *Shyers v. Metropolitan Prop. & Cas. Ins. Co.*, No. 24-5036, 2025 WL 2088721, at *1 ("Plaintiffs generally cannot defeat summary-judgment motions by relying on facts . . . distinct from their complaints' factual theories").

7. When Crosby arrived at the property, it was unsecure. UMF 16. As Crosby testified in his

deposition:

> At this particular property, when we arrived it was all unsecure. Everything was
> open. It -- it had appeared that it was abandoned. The home was partially like
> boarded. There was like broken windows. The doors were broken. The back door
> was wide open.

Doc. 43-1 at 7 (Crosby dep. at 16:19-24).

Defendants' statement of material facts and Defendants' exhibits do not specifically

address the status of the gate at the side of the house, leading to the back part of the property.

However, Plaintiffs provided the Court with a different page from Crosby's deposition in which

he testified that the side gate to the property was open when the deputies arrived. Doc. 48-7 at 4

(Crosby dep. at 19:24-20:8). By contrast, Mr. Franco's affidavit avers that he "had a habit of

closing the gate" and "[t]he gate was always closed in general" but does not address whether it

was closed or open at the time the deputies and code enforcement arrived. Doc. 48-1 ¶. Plaintiffs

submit a photo of the scene and the gate being closed, Doc. 48-6, but do not represent that this

was the condition of the property at the time of law enforcement's arrival. Because Defendants

have not asserted as an undisputed fact that the gate was open (and so Plaintiffs were not

squarely put on notice of the need to address this fact in their response), the Court stops short of

concluding for purpose of the present motion that the gate was open when Defendants first

arrived. Nor does the Court need to resolve this factual issue, as the Court's resolution of the

present motion does not turn on the status of the gate when Defendants arrived.

  C. <u>Whether Plaintiffs had permission to reside on the property</u>

Defendants' proffered UMF 12 is "Plaintiffs did not have permission to live on the

property." Doc. 43 at 4. In support, Defendants cite an email from Marcos Forrester, the property

owner, dated April 5, 2021 at 4:55 pm, stating "the Franco family at no time had any permission

to reside at the property located at 4821 Isleta Blvd SW." Doc. 43-2 at 3. Although the email is authenticated by the recipient, Harry Landis, an investigator for Bernalillo County, it is not authenticated by Forrester himself. When offered for the truth of the matter asserted, the contents of the email constitute hearsay. And, absent some exception, hearsay testimony cannot be considered on summary judgment. *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998); *see also Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1271 (10th Cir. 2021) (hearsay contained within an affidavit remains inadmissible hearsay beyond judicial consideration at summary judgment). Because Defendants provide no recognized exception that would allow the contents of the email to be considered for the truth of the matter asserted, the Court does not do so.

Defendants also cite to the deposition of Crosby, who testified that "while we were there [at the property] I got a call confirming that, and the property owner, Mr. Forrester, said no, no one should be there." Doc. 43-1 at 8 (Crosby dep. at 25:15-17). This, too, is hearsay if offered to prove the truth of whether Forrester gave permission for Plaintiffs to be at the property. As hearsay, it cannot establish Defendants' proffered UMF 12 for summary judgment.

Mr. Franco, by contrast, filed an affidavit which states:

I had permission from Marcos Forrester for my family to stay at the Isleta property in order to tend to the animals that we kept there.

Forester and I kept a verbal agreement allowing us to stay at the Isleta property.

My family and I were living at another one of his properties located at 1033 E. Louisiana, Apt. B in Albuquerque, New Mexico, approximately 1.5 years before the incident at the Isleta property.

Forester sold the apartment building, and it went under new management. Forester then offered to let us stay at the Isleta property. He asked us to remove items from the Isleta house, bring our RV to stay in in the meantime, and that once the Isleta house was cleared up we could move into it.

Doc. 48-1 ¶ 9-13. Because Mr. Franco has personal knowledge of his asserted agreement with Forrester, this statement is not hearsay.

Even if Forrester's statements were not excluded as hearsay, however, they would still conflict with Mr. Franco's affidavit testimony. To the extent a dispute exists about the credibility of the competing statements, courts are not allowed to make credibility determinations in deciding motions for summary judgment. *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1170 (10th Cir. 2020). Therefore, drawing all factual inferences in favor of the nonmoving party, the Court must conclude for purposes of Defendants' summary judgment motion that, as Mr. Franco swore, Forrester gave Plaintiffs permission to reside on the property.

Thus, at most, what Crosby said Forrester told him, and what Crosby says he told Sanchez, can only be used to establish the subjective beliefs of Crosby and Sanchez. Crosby and Forrester spoke while Crosby was at the front of the house, before Crosby encountered Ms. Franco. Doc. 43-1 at 7 (Crosby dep. at 39:4-21). During that conversation, Forrester informed Crosby that there was not supposed to be any people living on the property. UMF 11. After speaking to Forrester, Crosby relayed to the sheriff's deputies that the homeowner had advised that nobody was supposed to be present on the property and the property owner had not allowed anybody to stay there. UMF 15. Although Crosby's account of what Forrester told him cannot be used for the truth of the matter asserted, it can be used, albeit less significantly, to establish what Crosby understood to be true. This is not hearsay: offering the basis for Crosby's belief that no one was supposed to be on the property is different than offering Forrester's statement to Crosby for the truth of the matter asserted. *See* Fed. R. Evid. 801(c)(2) (principles against hearsay only implicated if the statement is offered for the truth of the matter asserted).

Regarding Sanchez, Plaintiffs argue that a contradiction regarding exactly when Crosby relayed to Sanchez that "no one was supposed to be on the property" impeaches Sanchez's testimony that Crosby relayed this information to him. Doc. 48 at 10. To the extent Sanchez testified Crosby provided information that no one was supposed to be on the property during a morning briefing which occurred before Defendants arrived at the property, Sanchez's testimony might be inconsistent with Crosby's testimony. However, regardless of what Sanchez said Crosby said at the morning briefing, Sanchez clearly testified that, *when* they "got to" the property, Crosby informed deputies that no one was supposed to be on the property.[3] Sanchez's clear statement about when he learned no one was supposed to be on the property, however, is arguably inconsistent with Crosby's statement that he did not talk to Forrester until *after* they got to the property. Taking Crosby's statement as true, and given that Sanchez entered the property before Crosby (UMF 17), Crosby's conversation with Forrester may have occurred after Sanchez had already begun to search the property. Summary judgment plaintiffs may offer

---

[3] First, Sanchez testified that:

> We specifically were advised by Carlos Crosby, some residences that we were to check that day, **we got to one of the locations there on South Isleta, and he advised us**, this is the location, and the homeowner advised us **that nobody is supposed to be present** and that he had not allowed anybody to stay there.

Doc. 43-4 at 3 (Sanchez dep. at 6:16-21 (emphasis added)). Immediately after this explanation, Plaintiffs' attorney and Sanchez had the following dialogue:

> Q. Now, you recall receiving **this information about the homeowner** on the morning of?
>
> A. Yes, sir. We have a briefing beforehand, before going into any of them, and they essentially brief us about what's going on. And then when we get there, traditionally they would give us a short recap of what was going on.

*Id.* at 6:22-7:3 (emphasis added).

"circumstantial evidence that, if believed, would tend to discredit the police officer's story, and [a court may] consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1170 (10th Cir. 2020). Nonetheless, because Sanchez's subjective belief about whether anyone was supposed to be on the property is not essential to resolution of the present motion, the Court declines to make a factual finding about what information Sanchez had before he entered the property.

    D.    <u>Defendants' entry onto the property</u>

Sheriff's deputies entered the property before code enforcement, in order to make sure the property was safe for the code inspection. UMF 17. As they entered the property, Sanchez saw animals everywhere including a dead animal. UMF 19. Sanchez found a travel trailer[4] behind the residence and a structure[5] at the end of the driveway. UMF 18.

Ms. Franco came out of the trailer when the deputies entered the back of the property. UMF 20. At the time of the initial encounter with Ms. Franco, she was very amped up and agitated. UMF 21.[6] After Ms. Franco came out of the trailer, she kept trying to go back in and close the door on the deputies. UMF 22. Sanchez initially entered the trailer to make sure the location was safe. UMFs 23, 63. As he entered, he observed a large kitchen knife and advised

---

[4] The travel trailer (also sometimes referred to as a camper trailer) has a kitchen, a bathroom, and beds. It is designed to be towed behind another vehicle when it is moved, as it has no engine.

[5] The parties variously refer to this structure as a barn or a shed. From Plaintiff's video exhibit (exhibit 15), it appears that this structure could also be fairly characterized as a garage. Which of those labels is placed on this structure is immaterial to the Court's analysis and so the Court will simply refer to this structure as a structure.

[6] Sanchez testified to this effect in his deposition. Doc. 43-4 at 3 (Sanchez dep at 13:25-14:4). Plaintiffs contend that the video evidence contradicts this account. Doc. 48 at 11. Plaintiffs, however, do not provide a record citation for this dispute and Plaintiffs' video exhibit 15 does not depict the very beginning of the encounter between Ms. Franco and Sanchez.

Ms. Franco she could not re-enter the trailer out of concern for weapons or the presence of any other people. UMF 23. Sanchez asked Ms. Franco if anyone else was present and she said no. UMF 24.

After clearing the trailer, the deputies headed toward the structure in the back of property. UMF 25. The structure had a room with a closed door. As deputies approached, they heard a noise coming from behind the door. UMF 26. Prior to clearing the structure, Sanchez unholstered his weapon and held it at the "low ready" position. UMF 27. The deputies announced their presence. UMF 27. Sanchez found three children inside, sleeping on a mattress on the floor, and reholstered his weapon. UMF 27.

After the structure was cleared, Crosby attempted to speak with Ms. Franco and asked her why she was there. UMF 28. However, according to Crosby, Ms. Franco would not listen. UMF 28. The only way Ms. Franco would agree to speak with code enforcement was if everyone left the back area of the property. UMF 29. Ms. Franco asked everyone to walk to the front of the property because she wanted to protect her kids. UMF 30. Ms. Franco, her teenage son, Crosby, and the deputies went to the front of the property beyond the gate. Doc. 48 at 11; UMF 28.

After discovering the children in the structure, Skinner contacted Bernalillo County Sheriff's Office Safe Child Unit. UMF 31. Daugherty, a detective with the Safe Child Unit, received the call and Skinner provided a briefing on what they had encountered and requested assistance. UMF 32. Among other things, Skinner advised Daugherty that Ms. Franco was being combative and uncooperative. UMF 32.

At this point, Ms. Franco was outside the gate receiving medical attention. UMF 33. She spoke with her husband who told her to lock the gate to the back area of the property. UMF 33-34, 36. When Daugherty arrived, Ms. Franco had locked or was locking the gate. UMF 35; Doc.

48 at 12. Daugherty knew there were still two younger children in the back in the structure on the other side of the locked gate. UMF 36. During his initial exchange with Ms. Franco, Daugherty did not feel like he was getting straight answers on the location of the children, and he felt like Ms. Franco's actions in locking the gate were consistent with her trying to stall. UMF 38. Mr. Franco arrived on the scene, and Ms. Franco began yelling at him, "Be careful, he's going to shoot you," which caused Daugherty concerns about the security of the scene. UMF 39.

Mr. Franco was providing Daugherty different accounts of their living status. UMF 47. However, Mr. Franco did inform Daugherty that there had been multiple contacts with law enforcement and animal control, which led Daugherty to believe the family had been staying on the property and the children had been living in the structure. UMF 47. Daugherty entered the property to check on the welfare of the children. UMF 40. Daugherty observed ducks and chickens in the structure where the children were located and living conditions saturated with feces. UMF 41. In the structure, he found 2 mattresses for 3 children. UMF 42. The mattresses were very dirty and the younger children were not wearing shoes and their feet were covered in chicken feces. UMFs 43-44. Daugherty also observed exposed electrical conduits. UMF 45.

Crosby was called to the back yard after the area had been secured to conduct his inspection. UMF 49. Crosby observed numerous code violations and unsafe conditions. With respect to the trailer, he observed sewage dripping out of it and saw that Plaintiffs had been dumping their sewage on the side yard and draining the gray water from their washing machine on the floor. UMFs 50 & 58. He observed extension cords running to the trailer, a lack of utilities to the property, and saw that Plaintiffs had been tampering with the electric meter to get power. UMFs 51, 55, 56. With respect to the structure where he believed the children were sleeping, he observed animal feces and animals; exposed wires, light switches with exposed wire, and a video

game controller hanging from light switches with exposed wire; surface sewage; buckets serving

as toilets but no traditional toilets; and dilapidated conditions of the structure. UMFs 52-54, 57.

In the main house, Crosby observed a camper toilet over a drain and a bucket used to flush,

which does not work as sewage backs up and starts to surface.[7] UMF 59.

E.    Plaintiffs' arrests

Daugherty arrested and charged Mr. and Ms. Franco with interfering with an

investigation and child abuse. UMF 60. Daugherty charged Mr. and Ms. Franco because they

admitted they conspired to lock the front gate after law enforcement arrived on scene. UMF 61.

They were charged with child abuse because of the living conditions on the property. UMF 61.

**DISCUSSION**

I.    **Standing/Legitimate expectation of privacy**

Defendants' primary argument in support of their motion for summary judgment is that

Plaintiffs lack "standing" to complain of the Fourth Amendment violations alleged in the

Complaint. Defendants' use of the term "standing," like the Tenth Circuit's use of the same term

in some cases such as this, does not refer to the Article III standing doctrine. Doc. 43 at 11-13;

*United States v. Gordon*, 168 F.3d 1222, 1226 n.2 (10th Cir. 1999). Instead, the term "standing"

as used here refers to whether courts will allow a person to challenge the constitutionality of a

search or seizure. And the answer to this question turns on whether the person has a "legitimate

expectation of privacy in the area searched." *United States v. Ruiz*, 664 F.3d 833, 838 (10th Cir.

2012) (internal quotation marks omitted). In determining whether plaintiffs have a legitimate

---

[7] Mr. Franco stated in his affidavit that, "The sewage drain for the cleanout issue is not true because we could attach the RV drain to the actual sewage drain and the waste would flow there." Doc. 48-1 at 3. This is different than saying that the drain on the RV *was actually* attached to the property's sewage drain. Relevant to the present analysis is not what could have been attached but what officers observed at the time.

expectation of privacy, courts consider two factors: "(1) whether the defendant manifested a subjective expectation of privacy in the area searched and (2) whether society is prepared to recognize that expectation as objectively reasonable." *Id.* (internal quotation marks omitted).

The Court agrees with Defendants that the threshold question is whether Plaintiffs have standing to sue Defendants for the constitutional violations alleged in the Complaint. As the United States Supreme Court has repeatedly emphasized, Fourth Amendment rights are personal rights which may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Where society does not recognize a person's subjective expectation of privacy in another's property to be objectively reasonable, that person suffers no Fourth Amendment violation as a result of the illegal search of the other's property. Consequently, someone trespassing on another's property cannot successfully bring a Fourth Amendment claim in connection with an illegal search of that property. Even individuals who own the structures they build on another's land have no reasonable expectation of privacy in those structures if they have no legal right to occupy the land on which the structure sits. *United States v. Lowe*, 117 F.4th 1253, 1261 (10th Cir. 2024).

In deciding whether someone has a reasonable expectation of privacy in a place searched, one consideration is whether that person has the right to exclude others, as "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." *Rakas*, 439 U.S. at 143 n.12; *see also id.* at 149. Another consideration is whether a person is legitimately on the premises of the place searched. *Id*. at 148. This factor is not controlling, however, as a legitimate presence on the premises searched is insufficient by itself to confer standing to challenge the search. *Id*. at 130, 143 (passengers in car, none of whom owned car, had no reasonable expectation of privacy in the

locked glove box of car or area under the front passenger seat; therefore, even if search of these areas was illegal, passengers had no valid claim that search of car violated their Fourth Amendment rights).

Thus, as Defendants assert, if Plaintiffs were trespassers on the property searched, they have no standing to challenge any of the searches that occurred on that property. Doc. 43 at 13-14 (asserting Plaintiffs have no standing to object to what Defendants term the "safety sweep" of the property because Plaintiffs have not shown that they were authorized to be living on the property and, without authorization to be there, Plaintiffs had no legitimate expectation of privacy to object to the search). If, on the other hand, Plaintiffs had permission to reside on the property and the legal right to exclude others from the property (not including the owner of the property), they have standing to challenge the searches that occurred on the property. *Rakas*, 439 U.S. at 143 n.12 ("One of the main rights attaching to property is the right to exclude others, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." (citation omitted)); *See also United States v. Poe*, 556 F.3d 1113, 1122 (10th Cir. 2009) (residency crucial factor in determining standing to challenge search of property).

The question is thus the scope of permission Plaintiffs received from the landowner. Plaintiffs argue the side gate and back yard were within the curtilage of the "main house" and that the unlawfulness of a warrantless search in these areas is clearly established. Doc. 48 at 10, 14. The Court understands Plaintiffs' use of the term "main house" to mean the large, abandoned house that can be seen from the street. No evidence exists that Plaintiffs resided in the main house. Nor do Plaintiffs argue that they have standing to challenge a search of the main house. If Plaintiffs have no standing to challenge a search of the main house, a question arises as to

whether Plaintiffs have standing to challenge a search of the main house's curtilage—the area immediately surrounding and associated with the home that is considered part of the home itself for Fourth Amendment purposes. *Jardines*, 569 U.S. at 6.

The Supreme Court has held that a "casual visitor who has never seen, or been permitted to visit, the basement of another's house" did not have standing to object to a search of the basement. *Rakas*, 439 U.S. at 430. Because Plaintiffs do not discuss any entitlement to reside in—or even enter—the main house, Plaintiffs have not demonstrated a privacy interest in the main house sufficient to confer standing to challenge a search the main house. Plaintiffs do not, therefore, have automatic standing to challenge a search of the main house's curtilage as a byproduct of standing to challenge a search of the house. Not having established a privacy interest in the main house, however, does not mean Plaintiffs necessarily lack standing to challenge a search of the area around the house. Even absent an expectation of privacy in the house, Plaintiffs could have standing through control over, and the ability to exclude others from, the area immediately surrounding the house. Accordingly, the Court applies the two factor test the Tenth Circuit set forth in *Ruiz* to determine whether Plaintiffs have standing to challenge the searches at issue.

That Plaintiffs had a subjective expectation of privacy in the property they occupied is not in contention. Plaintiff's video exhibit depicts Ms. Franco repeatedly objecting to Defendants' presence on the property, to include asking whether they have a search warrant. *See* Plaintiff's Exhibit 15. After she convinces law enforcement to walk to the front of the property, Mr. Franco instructs Ms. Franco to lock the gate. Ms. Franco then closes and locks the gate to prevent law enforcement from re-entering the property. Drawing all reasonable factual inferences

in favor of Plaintiffs, as the Court must, the Court concludes that Plaintiffs had a subjective expectation of privacy in the property they occupied.

As to the second prong, whether Plaintiffs had an objective expectation of privacy as to the property searched that society is prepared to recognize, a factual dispute exists. For the reasons set forth above, the Court has resolved this factual dispute in favor of Plaintiffs, the nonmoving party. The material fact for purposes of this motion is thus that Forrester gave Plaintiffs permission to stay on the property to tend to the animals living there. Therefore, Plaintiffs had an objective right to stay in the trailer on the property and to control access to the property, to include locking the gate to the property and denying permission to search the property, including the area around the main house.[8]

In reply, Defendants cite two cases to refute Plaintiffs' contentions. Doc. 52 at 9. First, Defendants cite *Minnesota v. Carter*, where the Supreme Court held that "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder [for a few hours at a commercial property] may not." 525 U.S. 83, 90 (1998). Defendants' citation to *Carter* is unavailing. Here, Mr. Franco averred that "I had

---

[8] Plaintiffs also argue, "A person who keeps personal items in a garage to which he has access with a key has a reasonable expectation of privacy in the garage." Doc. 48 at 15 (citing *United States v. Arreola-Alvarado*, 603 F. Supp. 3d 534, 542 (E.D. Mich. 2022); and *Jones v. United States*, 362 U.S. 257, 259 (1960) (person who had a key and slept at a friends' apartment "maybe a night," had a reasonable expectation of privacy)). Plaintiffs do not assert as an undisputed material fact with record support, however, that Plaintiffs possessed a key to the "garage" (aka structure). Further, because the structure was unlocked when police officers arrived, the video does not demonstrate that Plaintiffs possessed such a key. At some point, Mr. Franco asserts that he possesses a key to the house on the property. In addition, because Mr. Franco directed Ms. Franco to lock the side gate on the property and Ms. Franco did lock the gate, an inference can be made that Plaintiffs possessed a key to the gate. Neither party asserts Plaintiffs' possession of any key as a material undisputed fact with a citation to support in the record, however, and Plaintiffs make no further argument regarding the significance of a house or gate key. Because the parties do not address whether Plaintiffs possessed a house and gate key or the significance of such possession, neither does the Court.

permission from Marcos Forrester for my family to stay at the Isleta property in order to tend to the animals that we kept there." Doc. 48-1 ¶ 9. The semantics of this phrase could be debated—what length and what manner of "stay" did Forrester authorize? On summary judgment, however, the Court draws all reasonable factual inferences in favor of the nonmovants. Upon doing so, the Court concludes Mr. Franco has established, at least for purposes of Defendants' motion, that his family had authorization to occupy the trailer on Forrester's property as their living quarters while tending animals.

That Plaintiffs were authorized to tend animals on the property also indicates that they were authorized to be there every day to tend to the animals' daily needs. Such permission far exceeds the scope of permission conferred on the temporary commercial visitor in *Carter*. Because, drawing all reasonable inferences in favor of Plaintiffs, Plaintiffs were authorized to reside on the property searched, the present case does not require the Court to determine where to draw a line in the gray area between resident and casual visitor.

Second, Defendants cite *United States v. Guzman*, 710 F. Supp. 3d 996 (D.N.M. 2024), for the proposition that a resident has no expectation of privacy in a substandard property because "an agreement with the owner to reside on or otherwise occupy substandard property was wrongful at its inception." Doc. 52 at 5. The property at issue in *Guzman*, however, had been deemed "substandard" by the City of Albuquerque prior to the search. 710 F. Supp. 3d at 1000-01. As such, the City had posted notices on the property that it was unsafe to occupy and that occupying the property was illegal, constituting a misdemeanor offense. Despite these notices, the defendant lived in a trailer on the property. When police officers conducted a warrantless search of the property, they found a firearm that the United States used as evidence against the defendant in a case it later filed. *Id.* at 1002. In considering the defendant's motion to suppress

evidence of the firearm, the district court held that the defendant had no objective expectation of privacy in the property searched. *Id.* at 1004. In so holding, the district court reasoned that once the "substandard" notice was posted, the defendant lacked any legal right to be on the property even if he had the owner's consent. *Id.*

In contrast to the facts in *Guzman*, Defendants here do not show that, prior to their search, the relevant municipality or county legally deemed the property "substandard," with appropriate notice posted that it was illegal to occupy. Defendants' observation of code violations after entering the property is not the legal equivalent of prior process and notice deeming it a crime to inhabit the property.

Thus, the Court rejects Defendants' arguments and finds that Plaintiffs have presented facts sufficient to demonstrate an expectation of privacy in this property that society is prepared to recognize as legitimate. Therefore, Plaintiffs have standing to assert a violation of their Fourth Amendment rights.

## II.    Plaintiffs' Assertions of Constitutional Violations

Having determined that Plaintiffs have standing to assert violations of their Fourth Amendment rights, the Court separately analyzes the various searches and seizures that Plaintiffs claim violated their Fourth Amendment rights.

### A.    Initial entry onto property

Plaintiffs allege that Defendants' initial entry onto the property constituted an illegal search and that Defendants Crosby, Sanchez, Skinner, and Barnes participated in this initial entry. Doc. 1 ¶¶ 11-12. Defendants' motion begins with a request to grant qualified immunity on the search and seizure claims as to Defendants Barnes and Skinner, "who are not alleged to have conducted any search or seizure." Doc. 43 at 15 n.1. Defendants' own police reports, however, support Plaintiffs' allegation that Defendants Barnes and Skinner entered the property. *See* Doc.

48-11 at 1 (Skinner report); Doc. 48-12 at 1 (Barnes report).[9] And, Defendants offer no argument that Defendants Barnes and Skinner did not enter the property. Therefore, for purposes of the present motion, the Court concludes that Barnes and Skinner entered the property. Having so concluded, the Court next considers whether entering the property (going past the side gate and onto the back yard located at 4821 Isleta Blvd. SW) by itself constitutes a search for purposes of the Fourth Amendment.

The Court begins this analysis by identifying what is not at issue: the boundary between curtilage and non-curtilage on the property. As noted above, Plaintiffs argue that Defendants' act of entering the side gate constituted entry into the curtilage of the main house. Doc. 48 at 10. Beyond this assertion (which Defendants do not address), the parties do not brief what portions of the property constitute curtilage and whether Defendants illegally entered this curtilage without a warrant.

Whether an area searched constitutes curtilage is often an important question in cases involving allegations of an illegal search because the Supreme Court has "recognized that the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987). Four of these factors are: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to

---

[9] These statements in the police reports are admissible as party admissions. Fed. R. Evid. 401(d)(2). For purposes of the present motion, the statements may also be admissible as "a matter observed" in a public record. Fed. R. Evid. 803(8); *Wood v. Millar*, No. 13cv923 RB/CG, 2015 WL 12661926, at *4 (D.N.M. Feb. 19, 2015).

which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301.

On the other hand, because the area beyond the curtilage of a house—what the Supreme Court has referred to as "open fields"—is not enumerated in the Fourth Amendment, not all warrantless investigations on private property constitute a Fourth Amendment violation. *Florida v. Jardines*, 569 U.S. 1, 6 (2013). For instance, the Court has held that a barn 60 yards from a house and 50 yards outside of the fence surrounding the house should not be treated as an adjunct of the house. *Dunn*, 480 U.S. at 302; *see also Rieck v. Jensen*, 651 F.3d 1188 (10th Cir. 2011) (a portion of the unpaved driveway within a few feet of the closed entrance gate and several hundred feet away from the home is not within the curtilage of the home). Thus, even though law enforcement's entry onto such private property may have constituted a trespass, it did not constitute a Fourth Amendment violation. *Rieck*, 651 F.3d at 1191-92.

Although deciding whether a specific piece of property searched constitutes curtilage or an open field is essential in many cases alleging an illegal search, neither party in the present case attempts to define such boundaries in their briefs. Nor does either party provide any analysis of the *Dunn* factors or provide the relevant facts that would guide the Court in considering the *Dunn* factors.

And there may be good reason for this. The present case does not involve a discrete search of a discrete area. Instead, it is undisputed that sheriff's deputies entered the property to "conduct [] a safety sweep of the property in aid of a code enforcement investigation." Doc. 43 at 14. The record indicates this safety sweep and subsequent code enforcement investigation involved a search of the entire property located at 4821 Isleta Blvd. SW. Given the breadth of the safety sweep and code enforcement investigation, it is likely that the Defendants involved in the

safety sweep and code enforcement investigation entered both areas that would be defined as curtilage of the trailer in which Plaintiffs lived, as well as areas that would be defined as open space. Because it appears undisputed that at least some of the area Defendants entered constitutes curtilage of the trailer in which Plaintiffs lived, there may be no point to defining the exact boundaries between curtilage and open space. In any event, Defendants make no distinction between the parts of the property that constitute curtilage and those that do not. Consequently, neither does the Court.[10]

Having established that the legality of the searches at issue do not turn on the boundary between curtilage and open fields, the Court turns to whether entry onto the land located at 4821 Isleta Blvd. SW was otherwise permitted.[11] Defendants assert that they:

> are entitled to summary judgment as to any claim predicated upon an unlawful search, since there was no Fourth Amendment violation in the conduct of a safety sweep of the property in aid of a code enforcement investigation.

---

[10] What constitutes curtilage would also be an important consideration had Defendants argued that their initial warrantless entry was the product of a "knock and talk" attempt. *See Jardines*, 569 U.S. at 8 (recognizing legality of knock and talks). Here, however, Defendants do not assert they entered the property to perform a knock and talk. And the Tenth Circuit has emphasized that law enforcement's purpose in entering a home's curtilage without a warrant matters. *United States v. Carloss*, 818 F.3d 988, 992-93 (10th Cir. 2016) ("In *Jardines*, officers approached the front door of a home, not seeking a consensual knock-and-talk, but instead specifically to conduct a search from the porch."). In the present case, Crosby went to the property to perform a code inspection and the deputies were there to conduct a "safety sweep" in advance of that code inspection. UMFs 1-3, 14, 17. Rather than approaching the trailer in which Ms. Franco resided to conduct a knock and talk, Defendants assert that they "discovered a trailer and an occupant" and that "at the outset, and following that discovery [of the trailer], it was reasonable for the officers to conduct a protective sweep of the property to ensure the safety of code enforcement officers and themselves." Doc. 43 at 17. Thus, the record makes clear that the initial entry past the gate and onto the land located at 4821 Isleta Blvd. SW was not part of a knock and talk.

[11] Although Defendants argue that they did not engage in an *unlawful* search, they do not argue that they engaged in no search at all. *See* Doc. 43 at 17 ("Defendants are entitled to qualified immunity for the walk-through of Plaintiff's trailer and the search of the barn or shed by law enforcement and/or code enforcement.").

Doc. 43 at 14. That is, Defendants appear to argue that inspectors and police need no warrant to enter property to conduct a code enforcement investigation or to conduct a safety sweep in advance of a code enforcement investigation.[12]

Supreme Court and Tenth Circuit precedent runs counter to this argument. In 1967, the Supreme Court held that "administrative searches" for the purpose of enforcing fire, housing, and sanitation codes "are significant intrusions upon the interests protected by the Fourth Amendment," and that "such searches when authorized and conducted without a warrant" violate the Fourth Amendment. *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 534 (1967).

Similarly, in *Mimics, Inc. v. Village of Angel Fire*, the Tenth Circuit considered whether a building inspector violated the Fourth Amendment when he entered a business for a code inspection without a warrant and during a time when the public did not have access to the business. 394 F.3d 836, 839-40 (10th Cir. 2005). The court answered this question in the affirmative, holding that because the inspector had no warrant to enter the business and conduct an inspection outside of normal business hours, the search was illegal. *Id.* at 845. In other words, absent exigent circumstances, consent, or some other exception to the warrant requirement, an inspector seeking to conduct a code inspection but who does not have a valid warrant may not enter and inspect areas of private property that are protected by the Fourth Amendment and that are not accessible to the public. *Mimics*, 394 F.3d at 842-45.

In light of Supreme Court and published Tenth Circuit precedent, the Court rejects any argument that Defendants did not need to obtain a warrant before conducting a code inspection.

---

[12] That Defendants had no warrant when they performed the code inspection and safety sweep in advance of the code inspection is undisputed. Doc. 48-7 at 4 (Crosby dep. at 19:20-23).

There is no "code inspection exception" to the requirement that state actors obtain a warrant before conducting a search.

To be sure, however, an exigent need for an administrative code inspection may justify a warrantless search. *Camara*, 387 U.S. at 539 ("the law has traditionally upheld" warrantless inspections "in emergency situations"). Examples of exigencies include "seizure of unwholesome food"; "compulsory smallpox vaccination"; "health quarantine"; and "summary destruction of tubercular cattle." *Id.* "On the other hand, in the case of most routine area inspections, there is no compelling urgency to inspect at a particular time or on a particular day." *Id.* But here, Defendants present no evidence that the code inspection was anything other than routine. Thus, although they imply that code enforcement may be an exception to the warrant requirement because of its exigent nature, Doc. 43 at 17 ("the search was also justified by the exigency of the code inspection"), they cite no facts or legal authority to support the application of an exigency exception. Accordingly, Defendants fail to justify their warrantless entry onto the property through the exigent circumstances exception to the warrant requirement.

Nor do Defendants assert any other exception to the warrant requirement, such as consent. Although Crosby spoke with the property owner while Crosby was at the property, the conversation ended before Crosby could ask the property owner for consent to inspect the property. Doc. 43-1 at 4 (Crosby dep. at 25:1-6). And Plaintiffs, who occupied the property, certainly did not consent. In sum, addressing the first prong of a qualified immunity analysis, the initial warrantless safety sweep of 4821 Isleta Blvd. SW as a predicate to a code enforcement search was unconstitutional.

Addressing the second prong of a qualified immunity analysis, in 1967 the Supreme Court held administrative code enforcement searches require a warrant. *Camara*, 387 U.S. at

534. In 2005, the Tenth Circuit found the warrant requirement for code enforcement to have been clearly established for searches that took place in 1996 and 1997. *Mimics*, 394 F.3d at 839-40, 845. Accordingly, Plaintiffs have also met their burden under prong two of qualified immunity. Because Defendants Crosby, Sanchez, Skinner, and Barnes all entered the property as part of either the safety sweep or the code inspection, they are all subject to liability for this illegal entry. Accordingly, the Court denies Defendants' summary judgment motion for qualified immunity related to the initial entry of Defendants Crosby, Sanchez, Skinner, and Barnes onto the property located at 4821 Isleta Blvd. SW.

B.    Initial temporary seizure of Ms. Franco[13]

Plaintiffs allege "the deputies . . . seized Ms. Franco by ordering that she needed to stay outside and could not go back into the trailer." Doc. 1 ¶ 17. However, Plaintiffs' video evidence shows that only one deputy told Ms. Franco she could not go back inside the trailer, and Defendants' undisputed facts clarify that this officer was Sanchez. Plf's Ex. 15 at 00:19-1:00; UMFs 23, 63. At the outset, therefore, as to the initial seizure of Ms. Franco, the Court grants summary judgment in favor of all Defendants except Sanchez.

---

[13] A question exists as to whether Defendants' initial illegal entry onto the property necessarily exposes them to liability for all subsequent searches and seizures, even if those searches and seizures are otherwise supported by reasonable suspicion or probable cause. The Tenth Circuit recently joined other federal courts of appeals that have widely held that the exclusionary rule does not apply in § 1983 cases. *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 753 (10th Cir. 2021). In so doing, the Tenth Circuit cited with approval the Eleventh Circuit's decision in *Black v. Wigington*, 811 F.3d 1259 (11th Cir. 2016). *See Est. of Taylor*, 16 F.4th at 754. In *Black*, the Eleventh Circuit held that the fruit of the poisonous tree doctrine, which is a component of the exclusionary rule, does not apply in a civil suit against police officers. Thus, where police officers arrested individuals based on evidence discovered after an illegal entry, the police officers could be liable for the illegal entry, but not the subsequent arrest. *Black*, 811 F.3d at 1267-68. Therefore, the Court evaluates all Plaintiffs' search and seizure claims independently of one another.

As for Sanchez, the Court begins its analysis by considering whether denying a person access to their home constitutes a seizure and, if so, when such a warrantless seizure is justified. In *Illinois v. McArthur*, the police officers accompanied an individual, Tera, at her request to collect her belongings from a trailer where her husband, Charles McArthur, lived. 531 U.S. 326, 328-29 (2001). When Tera left the trailer, she told the police that McArthur had "dope" inside. *Id.* at 329. The officer knocked on the door and asked McArthur permission to search the trailer, which he refused. *Id.* One officer left to obtain a search warrant. *Id*. Meanwhile, police told McArthur, who by this time was also on the porch, that he could not return to his trailer unless a police officer accompanied him. *Id.* In subsequent criminal proceedings, McArthur moved to exclude evidence of drugs found inside the trailer "on the ground that they were the 'fruit' of an unlawful police seizure, namely, the refusal to let him reenter the trailer unaccompanied." *Id.*

The Supreme Court agreed that refusing to let McArthur re-enter the trailer constituted a "temporary seizure" conducted without a warrant. *Id.* at 330. Thus, unless there was some exception to the warrant requirement, the seizure was illegal. The Court explained:

> When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable. In the circumstances of the case before us, we cannot say that the warrantless seizure was *per se* unreasonable. It involves a plausible claim of specially pressing or urgent law enforcement need, i.e., "exigent circumstances." Moreover, the restraint at issue was tailored to that need, being limited in time and scope. Consequently, rather than employing a per se rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable.

*Id.* at 330-31 (citations and parentheticals omitted). In *McArthur*, the Supreme Court found the balance between the restraint at issue and the justification for the restraint tipped in favor of law enforcement.

First, police had probable cause to believe that unlawful drugs were inside the home. *Id*. at 331-32. Second, "the police had good reason to fear that, unless restrained, McArthur would destroy the drugs before they could return with a warrant." *Id*. at 332. Third, "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy." *Id.* Rather than searching the trailer or arresting McArthur, police "imposed a significantly less restrictive restraint, preventing McArthur only from entering the trailer unaccompanied." *Id*. Fourth, "the police imposed the restraint for a limited period of time, namely, two hours"—the time reasonably necessary to obtain a warrant. *Id*.

In comparison, Defendants here argue:

> First of all, the on-scene detention and separation of Mrs. Franco from her trailer was justified by reasonable suspicion. *Hemry v. Ross*, 62 F.4th 1248, 1253 (10th Cir. 2023). Sheriff's deputies accompany Defendant Crosby for the safety of code enforcement officers. When officers arrived, they are not expecting to find anyone else present, much less anyone occupying any structure or trailer. Concerned for the safety of all present, Defendant Sanchez briefly entered the Plaintiff's trailer and exited.

Doc. 43 at 15. But weighing the factors the Supreme Court found relevant in *McArthur*, the balance tips in favor of Plaintiffs.

First, unlike in *McArthur*, police here had no suspicion that the trailer contained evidence of criminal activity that Ms. Franco might destroy if they let her re-enter the trailer while they sought a warrant. Instead, they assert that they detained Ms. Franco so that they could conduct a safety sweep of the trailer. As set forth below, however, safety sweeps are only constitutional if they are incident to arrest or are justified by exigent circumstances. Neither applies here because the purpose of the safety sweep was to clear the way for a warrantless, and therefore illegal, search. Thus, even though preventing Ms. Franco from re-entering her trailer constituted only a minimal restraint for a minimal period, Defendants' justification for this restraint—the need to

conduct a safety sweep in advance of an illegal search—cannot support even this minimal restraint.

Defendants next assert that "from the perspective of Defendant Sanchez, Plaintiff was a trespasser and the brief detention was conducted to support the safety sweep of the premises." Doc. 43 at 15. The Court agrees that if Sanchez had reasonable suspicion to believe Ms. Franco was a trespasser, Sanchez would have been justified in briefly detaining Ms. Franco to confirm or dispel his suspicion that she was committing a crime (trespassing) by being on the property. *Hemry v. Ross*, 62 F.4th 1248, 1254 (10th Cir. 2023) ("To satisfy the reasonable suspicion standard, an officer need not rule out the possibility of innocent conduct, or even have evidence suggesting a fair probability of criminal activity. Instead, he must only maintain a reasonable suspicion supported by articulable facts that criminal activity may be afoot.") (internal citations and quotation marks omitted).

The problem for Defendants, however, is that Sanchez did not detain Ms. Franco to confirm or dispel whether she was a trespasser. Defendants cite no evidence indicating that Sanchez asked questions or otherwise investigated the potential crime of trespassing. To the contrary, Defendants assert that the reason Sanchez detained Ms. Franco was to "support the safety sweep of the premises." Doc. 43 at 15. Defendants' characterization of Ms. Franco as a trespasser is in promotion of an argument that this status makes her dangerous and justifies a safety sweep; it is not in promotion of an argument that Sanchez was investigating the crime of trespass. Because Sanchez's seizure of Ms. Franco was not done to confirm or dispel whether she was a trespasser, Defendants' assertion of reasonable suspicion cannot justify the seizure.

C.    Search of the trailer

As with Ms. Franco's temporary seizure, Defendants offered undisputed facts that only Sanchez searched the trailer. UMFs 23, 63. Therefore, to the extent Plaintiffs bring Fourth

Amendment claims against any other Defendants in connection with the search of the trailer,

those Defendants are shielded by qualified immunity and entitled to summary judgment.

       1.    <u>Constitutional violation</u>

Related to Sanchez's search of Ms. Franco's trailer, Defendants argue that the search of

the trailer and of the structure behind the trailer were:

> justified by the exigency of the code inspection and the discovery of squatters
> and/or trespassers, at least from the perspective of the officers, namely Defendant
> Sanchez. Defendants were apprised that the property should not be inhabited and
> discovered a trailer and an occupant, Mrs. Franco. At the outset, and following
> that discovery, it was reasonable for the officers to conduct a protective sweep of
> the property to ensure the safety of the code enforcement officers and themselves.

Doc. 43 at 17.

In addressing Defendants' argument, the Tenth Circuit decision in *United States v.
Walker*, 474 F.3d 1249 (10th Cir. 2007), is instructive. That case arose when an anonymous

woman called 911 to report that two men inside a house had guns and were threatening to kill

each other. *Id.* at 1251. A sheriff's deputy went to the house, knocked on the front door (which

was slightly ajar), and announced that he was from the sheriff's office. *Id*. When he knocked, the

door opened further and someone from inside the house shouted, "Yeah, and I got a goddam

gun." *Id*. The deputy, along with two other deputies who had arrived on the scene, immediately

entered the house, handcuffed the occupant (Walker), and brought him to the front porch. *Id*. at

1252-53. They did not, however, place Walker under arrest. *Id*. The deputy "testified that

because the dispatcher had reported two men with guns in the house, the officers suspected that

someone else might still be in the house, either hurt or posing a threat to the officers. They

therefore conducted a sweep of the bedrooms, bathrooms, and closets, looking where someone

could have been hiding." *Id*. at 1253. During the sweep, deputies found a firearm which provided

the basis for charging Walker with being a felon in possession of a firearm. *Id*.

Walker moved to suppress evidence of the firearm on the grounds that the deputies' re-entry of his home to conduct a safety sweep constituted an illegal search. *Id.* at 1253. The district court denied Walker's motion, justifying the search as a "protective sweep" under *Maryland v. Buie*, 494 U.S. 325 (1990). *Walker*, 474 F.3d at 1254. The Tenth Circuit, however, noted "[t]his court has stated that a 'protective sweep' of a residence to ensure officer safety may take place only incident to an arrest." *Walker*, 474 F.3d at 1254. Because deputies had not placed Walker under arrest, the Tenth Circuit concluded: "*Buie* cannot support the sweep." *Id.*

As the Tenth Circuit recognized, however, *Buie* did not address whether exigent circumstances might otherwise exist to justify an arrest. *Id.* In *United States v. Najar*, the Tenth Circuit set forth the factors a district court must consider when deciding whether exigent circumstances justify a warrantless entry into a home: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." 451 F.3d 710, 718 (10th Cir. 2006).

*Najar*, like *Walker*, began with a 911 call. *Id.* at 715-16. In *Najar*, however, the 911 call disconnected after it was made. *Id.* The 911 dispatcher called the number back four times and, each time, the line was picked up and hung up. *Id.* at 716. Officers went to the residence where the call originated, knocked on the front door, and received no response. *Id.* The officers went to the side of the residence where they saw movement inside. *Id.* The officers resumed knocking and announcing their presence as police. *Id.* When the officers saw a man through a window of the residence, they shined their light inside, knocked on the window, and told the man to open the front door. *Id.* When he did, he told the officers that everything was okay, he had not called

911, no one else was in the house, and denied the officers' request to enter the house. *Id*. The officers entered anyway. *Id*.

In addressing whether such entry violated the Fourth Amendment, the Tenth Circuit concluded it did not. It reasoned: "Given the totality of the circumstances, the officers had reasonable grounds to believe someone inside the trailer may have been in need of emergency aid and immediate action was required." *Id*. at 720. Thus, the safety sweep in *Najar*, unlike in *Walker*, did not occur incident to arrest and was justified by a potential threat to someone other than the officers.

The difference between conducting a safety sweep for officer safety and conducting a safety sweep out of concern for the safety of someone inside the home searched made all the difference in *Walker*. After the *Walker* court concluded that the safety sweep in that case could not be justified under *Buie*, it recognized that "[t]he sweep may nevertheless have been proper under the exigent-circumstances doctrine set out in *Najar,* 451 F.3d at 717." *Walker*, 474 F.3d at 1254. In considering whether the exigent circumstance exception set forth in *Najar* could justify the safety sweep, the court noted "that both *Najar* and the Supreme Court opinion on which it relied, *Brigham City*, 547 U.S. 398, involved Fourth Amendment intrusions justified by a threat to a civilian's safety." *Walker*, 474 F.3d at 1254. Accordingly, the Tenth Circuit remanded the case "to the district court for consideration of whether exigent circumstances may have justified a search of Mr. Walker's home as a sweep for potential victims." *Id*.

Significantly, however, the Tenth Circuit did not remand the case for the district court to consider whether concerns for officer safety might also constitute exigent circumstances. To the contrary, the Tenth Circuit stated, "[i]n the context of this case . . . application of the exigent-circumstances doctrine to justify a sweep for the purpose of officer safety would eviscerate our

precedent establishing an incident-to-arrest requirement for such a protective sweep . . . .
[A]bsent clarification from an en banc court, we refrain from justifying this sweep by applying
the exigent-circumstances exception based on officer safety." *Id*. Thus, under *Walker*, Sanchez's
generalized concern for officer safety cannot constitute exigent circumstances to justify his
safety sweep of Ms. Franco's trailer.[14]

This conclusion is further supported by the Tenth Circuit's earlier decision in *United States v. Davis*, 290 F.3d 1239 (10th Cir. 2002). There, the Tenth Circuit wrote:

---

[14] The undersigned has previously written:

> [I]t seems unlikely that *Walker* would prohibit police from protecting themselves against a deadly threat that arises when they seize, but do not arrest, someone. For instance, the Tenth Circuit in *Walker* determined that exigent circumstances existed to justify law enforcement's entry into the defendant's home after he responded to law enforcement's announcement of their presence with the statement, "Yeah, and I got a goddamn gun." *Walker*, 474 F.3d at 1253. Specifically, the Tenth Circuit determined that although police could have retreated "it was also reasonable for [police] to take control of the situation by entering to disarm Mr. Walker, who could otherwise continue to pose a danger to the officers and others. Because the officers could reasonably believe that they needed to enter Mr. Walker's home to protect their own safety, and because they acted reasonably in entering and restraining Mr. Walker, we hold that the officers committed no Fourth Amendment violation in those actions." *Id*. Assume, after police seized (but did not arrest) the defendant, an individual in another room of the house yelled, "I have a goddam gun too." Allowing police to enter the home based on the first comment, but not another room in the home based on the second comment, would be an anomalous result. Thus, I do not recommend concluding that police can never justify a sweep based on exigent circumstances related to officer safety. Instead, I read Tenth Circuit case law as saying that, absent an arrest, police are not automatically allowed to search areas adjacent to someone they have seized for purpose of officer safety (the first situation recognized in *Buie*). This does not preclude police from protecting themselves against a known and exigent danger that arises in the course of the detention.

*United States v. Salazar*, No. 17cr831, 2017 WL 8950458, at *3 (D.N.M. Dec. 29, 2017), *report and recommendation adopted*, 2018 WL 522316 (D.N.M. Jan. 23, 2018). The need to enter a home, or another room in a home, to eliminate a known and imminent threat to officer safety, however, is different than entering a home for a generalized safety sweep.

> The government argues Mr. Davis' re-entry into his home, with the stated intention of getting his child, gave the officers the right to conduct a protective sweep of Mr. Davis' residence, in accord with *Maryland v. Buie*, 494 U.S. 325 (1990). As Mr. Davis points out, the government's argument may be briskly disposed with the definition of "protective sweep." As it appears in the first sentence of *Buie*, "a 'protective sweep' is a quick and limited search of premises, *incident to an arrest* and conducted to protect the safety of police officers or others." *Id.* at 327 (emphasis added). When the police in this case entered Mr. Davis' home no one was under arrest, and at that time, there was no probable cause to arrest anyone.

*Id.* at 1242 n.4 (alterations omitted; emphasis in Tenth Circuit opinion).

Defendants cite *United States v. Banks* in support of the proposition that a "protective sweep limited to search of premises for officer safety is constitutionally permissible." Doc. 43 at 15 (citing *United States v. Banks*, 884 F.3d 998, 1007, 1013 (10th Cir. 2018)). This is certainly true for "closets and other spaces immediately adjoining *the place of arrest* from which an attack could be immediately launched." *United States v. Bagley*, 877 F.3d 1151, 1154 (10th Cir. 2017) (quoting *Buie*, 494 U.S. at 334) (emphasis added).[15] Here, there is no arrest and so no space adjoining the place of arrest. And *Banks* does not discuss protective sweeps outside the "incident to arrest" situation. *See Banks*, 884 F.3d at 1007, 1013 (addressing a motion to suppress "evidence found at the Spencer house after his second arrest" and defining the search at issue as a "'protective sweep' [which] is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others" (quoting *Buie*, 494 U.S. at 327)). *Banks* therefore does not support Defendants' position in this case.

Defendants' argument additionally fails because their justification for conducting a "safety sweep" of the trailer was to make sure that the area was safe for a warrantless code

---

[15] For police to look beyond spaces immediately adjoining the place of arrest, they must have "specific, articulable facts supporting a reasonable belief that someone dangerous remains in the house." *Bagley*, 877 F.3d at 1153-54.

inspection. UMFs No. 14, 17, 23. As set forth above, no exigent circumstances or other

exception to the warrant requirement existed to justify the warrantless code inspection. Thus,

Defendants did not need to make sure the area was safe so that they could conduct a lawful

search. Instead, Defendants' professed need for a safety sweep was to make sure the area was

safe to proceed with an illegal warrantless search. To the extent officer safety was at issue, this

concern would have been better addressed by not conducting an illegal search at all. The need to

conduct an illegal search, unlike the need to make a valid arrest or to protect the victim of a

crime, cannot serve as a valid predicate for a safety sweep.

### 2.    Clearly established law

It is clearly established that warrantless searches of a home and its curtilage violate the

Fourth Amendment absent some exception. *Mimics*, 394 F.3d at 844 ("It is well-established that

a warrantless search is presumptively unreasonable under the Fourth Amendment and therefore

invalid unless it falls within a specific exception to the warrant requirement." (internal quotation

marks omitted)). Here, the exception for consensual searches does not apply as Defendants do

not offer facts showing that they had permission from Forrester or the Francos to search the

trailer. Nor does the exception for exigent circumstances apply as there are no facts based on

which a reasonable jury could find an exigency. Finally, as discussed above, the Court finds it

clearly established under *Walker* and *Davis* that a generalized protective sweep for purposes of

officer safety is lawful only if it is done incident to an arrest, and no arrest existed here to justify

such a sweep. Therefore, the Court finds Sanchez's search of the trailer violated Plaintiffs'

constitutional rights and that these rights were clearly established.

### D.    Search of the structure in back

Much of the analysis related to the search of the trailer applies to the search of the

structure near the trailer. First, the "protective sweep of the property" was not justified by the

"exigency of the code inspection" (*cf.* Doc. 43 at 17), for all the reasons articulated above with respect to the initial entry onto the property and the search of the trailer. Even if the property was substandard (*cf.* Doc. 43 at 15-16), it had not been officially declared substandard and there was no *Guzman*-like prohibition against occupying the property. Second, a safety sweep of the structure cannot be justified under *Buie* and its progeny because the search was not incident to an arrest. Third, there were no exigent circumstances to justify a warrantless search.

One difference in the circumstances leading up to the search of the trailer versus the search of the structure is that deputies heard a noise coming from inside the structure when they approached it. UMF 26. However, Defendants do not provide facts indicating that the noise presented such an imminent threat to their safety that entry into the structure was necessary to protect themselves. Indeed, given that the deputies had no reason to believe any other person was in danger, the deputies could have just withdrawn from the structure or the property. As noted above, the professed "need" to conduct a safety sweep cannot be predicated on the desire to illegally enter the property without a warrant to conduct a code inspection.

Finally, although Defendants reference their suspicion that the occupants were trespassers, they do not argue that their purpose for entering the property was to investigate the possible crime of trespassing. Instead, they state that they entered the property to conduct a code inspection and were surprised to find people on the property. Doc. 43 at 15 ("When officers arrived, they are not expecting to find anyone else present, much less anyone occupying any structure or trailer."). Thus, Defendants' entry into the structure was not in connection with a trespassing investigation. And even if it were, trespass is a non-violent misdemeanor. Law enforcement's interest in investigating a non-violent misdemeanor does not constitute an exception to the general rule that warrantless searches are illegal. *See Mascorro v. Billings*, 656

F.3d 1198, 1209-10 (10th Cir. 2011) ("exigent circumstances permitting officers to enter a suspect's home without a warrant in pursuit of the suspect" must involve "a serious offense coupled with the existence of an immediate and pressing concern such as destruction of evidence, officer or public safety, or the possibility of imminent escape"; the warrantless pursuit of suspect into home "for a mere misdemeanor traffic offense" is unconstitutional).

     E.    <u>Alleged seizure of children based on firearm</u>

In their complaint, Plaintiffs assert that Defendants' "use and/or display of handcuffs, and firearms" constituted a seizure in violation of their Fourth Amendment rights. Doc. 1 at 5. In their motion for summary judgment, Defendants acknowledge that after "Deputy Sanchez had been informed that nobody else was present and heard noises coming from the shed or barn in the back of the property . . . [h]e unholstered his weapon prior to opening the door and immediately reholstered the weapon." Doc. 43 at 16. However, Defendants argue, "Defendant Sanchez' brief use of his weapon while conducting a sweep of the back of the property did not amount to a seizure at all." *Id.* at 16. Plaintiffs do not address this argument in their response, and as it is Plaintiffs' burden to defeat qualified immunity, the lack of response alone would be sufficient to grant summary judgment on this claim. *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015); *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015) ("the *plaintiff* bears the burden of citing to us what he thinks constitutes clearly established law").

In the alternative,[16] the Court agrees that Defendant Sanchez did not effect a seizure when he briefly unholstered his weapon and held it at low-ready in the structure. "When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs

---

[16] *Cf. Cox*, 800 F.3d at 1247 ("[i]n the interest of thoroughness" a court may, sua sponte despite a plaintiff's waiver, survey whether the clearly established law would have put a reasonable officer on notice his conduct was unconstitutional).

only if (a) the officer shows his authority; and (b) the citizen submits to the assertion of authority." *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010) (internal quotation marks omitted; citing *California v. Hodari D.*, 499 U.S. 621, 625-26 (1991)). Plaintiffs' video exhibit does not demonstrate that any Plaintiff other than Ms. Franco saw the firearm. Plf's Ex. 15 at 2:43. And seeing Sanchez unholster his gun did not effect a seizure of Ms. Franco because she did not submit to an assertion of authority—rather, she instructed Sanchez to put the firearm away, and he did. *Id.* at 2:43-2:59.

Approximately thirty seconds after Sanchez reholstered his firearm, the video shows Ms. Franco's teenage son come out of a back room with his hands up. *Id*. at 3:30. No evidence exists that Ms. Franco's son saw Deputy Sanchez's unholstered firearm. But the video shows an independent reason Ms. Franco's son may have had his hands up: after Deputy Sanchez holstered his firearm, Ms. Franco yelled "he has a gun on my son . . . are the neighbors here . . . can somebody come out? They have a gun on my son!", *id*. at 2:56 to 3:08, and asked Sanchez "Are you going to shoot me to try to talk to my son? Are you going to try to shoot me right now to talk to my son?" *Id*. at 3:23 to 3:28. Further, Sanchez neither physically restrained Ms. Franco's son nor issued any type of verbal command to him at all. Absent evidence that Ms. Franco's son saw Deputy Sanchez's unholstered firearm, no reasonable jury could conclude that Sanchez seized Ms. Franco's son.

Sanchez is also entitled to qualified immunity because Plaintiffs have failed to provide binding precedent or a weight of authority that would put a reasonable officer in Sanchez's position on notice that briefly unholstering his firearm, keeping it pointed at the ground, and then reholstering it was unconstitutional under these circumstances. Ms. Franco had just recently, and falsely, told Sanchez that no one else was on the property; Ms. Franco became increasingly

agitated as Sanchez looked for anyone else who might be on the property; and then Sanchez heard a noise coming from somewhere within the structure that he could not see. UMFs 24, 26. Plaintiffs cite no law, and the court is not aware of any law, that clearly establishes the unconstitutionality of a police officer in this circumstance unholstering a firearm, briefly keeping it pointed at the ground, and then reholstering it.

Because the evidence does not support a conclusion that Sanchez seized Ms. Franco or her son and because Plaintiffs fail to cite clearly established law to put Sanchez on notice that his conduct would be illegal, Sanchez is entitled to qualified immunity. Further, the record does not indicate that any other police officer unholstered a firearm. To the extent Plaintiffs intend to argue that the deputies' mere display of firearms on their hips caused an unconstitutional seizure, Plaintiffs fail to provide facts or clearly established law to support such a contention. Consequently, the Court grants Defendants summary judgment on this claim.

F.    Daugherty's search of the property

When he arrived, Daugherty ordered the gate (which Ms. Franco had just closed and locked) to be opened. Once the gate was opened, Daugherty entered the property. The Complaint alleges that this constitutes an unlawful search. Doc. 1 ¶ 51. The Court has rejected Defendants' no-legitimate-expectation-of-privacy (standing) argument. In their motion, Defendants do not offer any other argument directed at the legality of Defendants' search after Ms. Franco locked the gate. In their reply, however, Defendants assert for the first time that "Daugherty's search was justified by the exigency of the children's safety." Doc. 52 at 6.[17] Defendants further argue

---

[17] Typically, a party who does not present an argument for the first time until reply waives that argument. *Star Fuel Marts, LLC v. Sam's E., Inc.,* 362 F.3d 639, 647 (10th Cir. 2004). Because Defendants have raised qualified immunity, however, the Court considers whether clearly established law existed at the time of the search to place Defendants on notice that their conduct would be unconstitutional. *Cox,* 800 F.3d at 1245-46. Part of this analysis necessarily involves

that when police conducted the present search (in 2020), no clearly established law existed to put them on notice that their warrantless search to check on the children was unconstitutional. In support of this argument, Defendants cite *Lowther v. Children Youth & Families Department*, 101 F.4th 742 (10th Cir. 2024). Doc. 52 at 6. Although *Lowther* is a 2024 case (making it useful for determining whether, under prong one, present legal authority indicates Defendants' entry onto the property was constitutional), it also provides a survey of the law that existed in 2020. Thus, the Court considers *Lowther* for both its analysis at prong one and at prong two.

*Lowther* arose after a teacher reported that a four-year-old student, who was exhibiting inappropriate behavior in class that was consistent with sexual abuse, claimed her father sexually abused her. 101 F.4th at 748. The child described the alleged abuse in detail, to include what her father said to her during and after he abused her. *Id*. Based on these reports, police went to the child's home where the child's mother initially refused to allow the police to enter. When the father arrived at the home, the police placed him in handcuffs and refused to allow him to enter the home, indicated to the mother that she would be detained if she did not allow police to come into her house, and then entered the house without a warrant. *Id*. at 750-51.[18] After the state

---

consideration of the published Tenth Circuit precedent Defendants cite in their reply brief. Thus, the Court considers whether clearly established law existed to place Defendants on notice that their entry onto the property would constitute an illegal search under the circumstances at the time. Further, because the Court resolves this issue in Plaintiffs' favor, it does not request supplemental briefing from Plaintiffs.

[18] Although the opinion does not clarify whether the mother permitted the police to enter after she was threatened with detention, the Tenth Circuit analyzed whether exigent circumstances existed to justify the warrantless entry and provided no indication that the warrantless entry was justified by the mother's consent.

dismissed the charges against the father, the mother and father sued for unconstitutional entry into their home and unconstitutional arrest[19] of the father, among other claims. *Id*. at 754.

At issue in *Lowther* was what the Tenth Circuit described as its "unclear" precedent "concerning the applicable exigency standards under the Fourth and Fourteenth Amendments in child welfare cases." *Id*. at 760. Specifically, at issue was whether Tenth Circuit precedent required a reasonable suspicion of imminent peril of abuse or whether exigency could alternatively be predicated on a reasonable suspicion of past abuse, i.e., no requirement of imminent peril. *Id*. at 765. The Court clarified that a reasonable suspicion of past abuse was insufficient to establish the exigency needed to justify a warrantless search, stating, "even in the child welfare context, there must be a threat of imminent harm when officials enter a home or seize children without a warrant or judicial authorization." *Id*. at 766.

This conclusion, however, did not provide the state of the law as of 2017, when police conducted the warrantless search and arrest at issue in *Lowther*. With regard to the state of the law in 2017, the Tenth Circuit acknowledged that it previously published a decision purporting to hold that exigency could be predicated on "a reasonable and articulable suspicion that the child has been abused *or* is in imminent peril of abuse." *Id*. at 765 (internal quotation marks omitted) (emphasis in original). "Given the disjunctive phrasing," the Tenth Circuit explained, "reasonable officials could have concluded that . . . exigent circumstances were present if there was reasonable suspicion of past abuse, even in the absence of reasonable suspicion of imminent harm." *Id*.[20]

---

[19] The Tenth Circuit assumed without deciding that handcuffing the father and placing him in the back of a patrol car constituted an arrest. *Lowther*, 101 F.4th at 756.

[20] *Lowther* applied this holding to both Fourth Amendment and Fourteenth Amendment claims. 101 F.4th at 756.

Applying *Lowther* to prong one of the qualified immunity analysis in this case, Daugherty's decision to enter the property was constitutional only if a reasonable officer in his position could reasonably believe that the children in the structure faced the threat of imminent harm. When Daugherty arrived on the scene, Ms. Franco, her teenage son, and the remaining Defendants were outside the gate to the property. UMFs 29-40. That is, everyone but the youngest children were outside of the gate to the property. What Daugherty personally observed, then, was a group of law enforcement personnel who had already entered the property calmly standing outside the gate. No indication exists that any of the law enforcement personnel who had just been in the structure and who had seen the children sleeping in the structure, but who took no action to protect the children from a threat of an imminent harm within the structure, conveyed to Daugherty an urgent need to protect the children still in the structure from the threat of an imminent harm.

Nor does the record indicate what information law enforcement on the scene conveyed to Daugherty. Defendants do not present any undisputed facts related to what Daugherty learned from the other officers when he arrived at the property. Defendants' UMFs state that Skinner called Daugherty and provided Daugherty with a briefing of what they had encountered including "that Ms. Franco was being combative and uncooperative." UMFs 31, 32. However, the UMFs do not represent that Daugherty learned about any of the facts Defendants rely on for exigency: "roaming farm animals, living conditions saturated with feces, exposed wiring, raw sewage, a dilapidated structure, no apparent plumbing or running water and extension cords being utilized to provide power to the barn." Doc. 52 at 7. Daugherty did not testify in his deposition that he knew about these conditions before he searched the property. Doc. 43-6 at 1. Although he testified that he received a phone call from Defendant Skinner, he gave no details

about that phone call and instead agreed that his report was the best evidence of the contents of that call. *Id.* (Daugherty dep. at 21:8-21). Daugherty's report states only that he learned the children were living in "deplorable conditions." Doc. 48-15 at 7.

With regard to prong one of the qualified immunity analysis, Daugherty knew before he searched the structure that the law enforcement who had just left the structure did so without taking any action to address any imminent peril the children might have been in, and those same officers were now calmly standing outside the gate to the property. Further, the record indicates that the only information Daugherty received before conducting his search was that conditions inside the structure were generally "deplorable." Doc. 48-15 at 7. Such information provides an insufficient basis for an objectively reasonable belief that the children in the structure faced a threat of imminent harm. As such, under *Lowther*, Daugherty's search was unconstitutional.

Daugherty conducted his search in 2020, however, when the standard in the Tenth Circuit was ambiguous. Thus, under *Lowther*, if Daugherty had a reasonable belief that the children in the barn had been abused, he would be entitled to qualified immunity under prong two. But Defendants offer no facts from which a reasonable jury could find that a reasonable officer would have believed an exigency existed due to past abuse—there are no facts relating to past child abuse in this record. Information that the children were currently sleeping in the barn in undefined "deplorable" conditions is insufficient to support a reasonable belief of a history of abuse. Thus, qualified immunity does not shield Daugherty from liability in connection with his search.

Next, the Court addresses Defendants' assertion that Crosby, Barnes, and Skinner did not participate in any searches of the property. Doc. 43 at 2, 14 n.2, 17 n.3. Although Defendants' analysis does not distinguish the first "safety sweep" from Daugherty's later entry of the

property, the Court must distinguish the two in its analysis. As discussed in more detail above, merely entering the property without a warrant for the purposes of a "safety sweep" constituted a search. Daugherty's entry through the locked gate was also undoubtedly a search.[21] Further, Defendants' undisputed facts state that Crosby accompanied Daugherty on this second search, which accurately reflects Crosby's deposition testimony. UMF 49; Doc. 43-1 at 6-7 (Crosby dep. at 37:21-38:10). Defendants do not, and cannot, refute that Crosby's re-entry and inspection was a search. The Court therefore denies Crosby qualified immunity with respect to this second search.

Barnes and Skinner present a different story. In response to Defendants' assertion that Barnes and Skinner participated in no searches, Plaintiffs offered no evidence that Barnes or Skinner took part in this second search. This is fatal to their claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) ("If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." (internal quotation marks omitted)). Based on Plaintiffs' failure to satisfy their burden in opposition to summary judgment, the Court grants qualified immunity to Barnes and Skinner on this claim.

G.     Daugherty's arrest of the Francos

Defendants move for summary judgment on Daugherty's arrest of Mr. and Ms. Franco, arguing:

---

[21] As the Court observed with respect to the first search, Defendants make no attempt to distinguish curtilage on the property from non-curtilage and do not argue that Daugherty's search was limited to non-curtilage areas of the property.

> [T]he decision to arrest was at all times supported by probable cause. At the outset, Plaintiffs were not lawfully on the property and were occupying a dangerous outbuilding.[22] Daugherty was contacted by Defendants Skinner and briefed on the situation. Upon arrival to conduct a child welfare investigation, Daugherty witnessed Mrs. Franco lock a gate, preventing entry to the back of the property where Daugherty knows more children are located, and preventing access by paramedics and investigators. Thereafter, Daugherty discovers living conditions that he believes are unsafe. There are chickens and ducks wandering where children are sleeping. The living quarters are saturated with feces. The children's feet are covered in feces. According to Defendant Crosby, there is raw sewage on the property, evidently draining from the unlawful trailer. There is exposed wiring where the children sleep, play and hang gaming controllers.

Doc. 43 at 16-17.

"A warrantless arrest is permissible when an officer has probable cause to believe that a person committed a crime." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (internal quotation marks omitted). "In evaluating whether the events leading up to this arrest amount to probable cause, we ask whether an objectively reasonable officer could conclude that the historical facts at the time of the arrest amount to probable cause. Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." *Id.* at 1116. In the qualified immunity context,

> "Arguable probable cause exists where 'a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law.'" *Felders ex rel. Smedley v. Malcom*, 755

---

[22] Daugherty did not charge Plaintiffs in connection with being unlawfully on the property or occupying a dangerous outbuilding. UMF 60. Defendants do not further elaborate on these alleged bases for the arrests. Moreover, Daugherty testified in his deposition that "I was aware that they [the Francos] had a lawful reason to be on the property." Doc. 43-6 at 9 (Daugherty dep. at 27:5-6). Thus, the facts known to Daugherty could not have formed arguable probable cause to arrest for being unlawfully on the property, i.e., trespassing. As to occupying a dangerous building, as discussed above, it is not a crime to occupy a "dangerous" building prior to code inspection and official condemnation of the property. No reasonable officer could believe that an arrest for occupying a dangerous building could be legally predicated on occupancy that occurs before the building is deemed unsafe.

F.3d 870, 879 (10th Cir. 2014) (quoting *Fleming v. Livingston Cnty.*, 674 F.3d 874, 880 (7th Cir. 2012)) (emphasis in original). *See Holmes*, 830 F.3d at 1140 ("[I]n the § 1983 qualified-immunity context, an officer may be mistaken about whether he possesses *actual* probable cause to effect an arrest, so long as the officer's mistake is reasonable—*viz.*, so long as he possesses 'arguable probable cause.'") (citations omitted); *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) ("Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists.").

*Cronick v. Pryor*, 99 F.4th 1262, 1270 (10th Cir. 2024). The Court therefore examines whether the arrests were supported by arguable probable cause to arrest Mr. and Ms. Franco for (1) interfering with a child welfare investigation; or (2) child abuse by endangerment.

1.    <u>Interfering with investigation</u>

In deciding whether arguable probable cause existed to arrest the Francos for interference with a child welfare investigation, the Court will first consider the arrest of Mr. Franco and then turn to the arrest of Ms. Franco.

As for Mr. Franco, the facts show that he instructed his wife to lock the gate over which they had control, which denied access to the back of the property over which they had control. Mr. Franco acted based on information from his wife that police searched his property and purportedly pulled a gun out on his son. Again, it is undisputed that the police did not have a warrant to enter the back of the property or any structures on the property. Further, Defendants do not represent that, or provide any facts showing, Mr. Franco had information that the police were conducting a child welfare investigation. Nor is there evidence that police informed Mr. Franco that they needed access to the property to execute a warrant (they had none) or to address an exigent circumstance. That is, Mr. Franco had no indication that police had a lawful justification to enter the property. Under such circumstances, the mere act of instructing his wife to close and lock the gate to the property falls far short of providing grounds to arrest Mr. Franco for the crime of interfering with a child welfare investigation. *See Camara*, 387 U.S. at 540

("appellant had a constitutional right to insist that the inspectors obtain a warrant to search and . . . may not constitutionally be convicted for refusing to consent to the inspection").

Finally, Defendants note that locking the gate prevented paramedics from accessing the children. Doc. 43 at 16. Again, however, Defendants provide no evidence that the children in the structure needed medical attention. Although Ms. Franco had earlier expressed concern that her teenage son suffers from seizures and that she has a heart condition, Plfs' Ex. 15 at 2:53-2:56, 3:38-3:41, 3:48-3:50, both Ms. Franco and her teenage son were standing outside the gate with Daugherty and the paramedics. Thus, even assuming a charge for interference with a police investigation could be predicated on locking a gate that made it harder for paramedics to access his children, Mr. Franco had no reason to believe that his younger children needed medical attention and no evidence exists that they did need medical attention. Indeed, because Mr. Franco was in his car driving to the scene when he instructed his wife to lock the gate, and no evidence exists that his wife or son informed him that paramedics were on the scene when they spoke to him on the phone, Mr. Franco had no way of knowing that locking the gate would prevent paramedics from going back to the structure.

As for Ms. Franco, Defendants do not offer undisputed material facts based on the record indicating whether, or when, Ms. Franco was aware Daugherty was conducting a child welfare investigation. Defendants instead provide the Court a link to an unauthenticated youtube.com video. Doc. 43 at 6. This video reflects that Daugherty informed Ms. Franco *after* she locked the gate that he was conducting a child welfare investigation. Daugherty then asked Ms. Franco to step away from the gate without giving her an opportunity to cooperate by unlocking the gate. Thus, even if the Court were to accept this video as summary judgment evidence as proffered by

Defendants,[23] the video undermines Defendants' argument by showing that Ms. Franco did not knowingly obstruct a child welfare investigation at the time she locked the gate.

Regardless of the video evidence, the Court concludes—as it did with Mr. Franco—that denying access to a property Ms. Franco is lawfully authorized to occupy by simply closing and locking a gate is not a crime where police have no warrant and no exigent circumstances exist to enter the property.

### 2.    Child abuse by endangerment

Defendants do not cite any criminal law related to child abuse by endangerment in their motion. Nonetheless, because this is one of the crimes with which Daugherty charged the Francos, in their response Plaintiffs cite and discuss the child abuse by endangerment statute, NMSA § 30-6-1(D) and (E). Doc. 48 at 20. In reply, Defendants then set forth the specific conditions they assert Daugherty discovered during his search that provided a basis to arrest the Francos for child abuse by endangerment. Doc. 52 at 7. Although Defendants do not also discuss the child abuse by endangerment statute or cases that deal with this statute, they do cite two Tenth Circuit cases in support of their argument: *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1238 (10th Cir. 2003), and *Lowther*, 101 F.4th 742.

These cases, however, do not deal with children living in dirty conditions. Instead, *Roska* concerned a mother with a condition that caused her to "inflict[] physical harm upon . . . her children in order to gain the sympathy and attention of medical personnel." 328 F.3d at 1238.

---

[23] Defendants provided the Court a link to youtube.com rather than submitting this video as an exhibit for the Court's records. The Court has concerns about citing youtube.com videos based on the possibility of alteration or destruction of the video after the Court opinion issues. Here, however, the Court is not citing the youtube.com video as affirmative evidence in support of a finding. Instead, it is noting that, even if considered, the youtube.com video would not support Defendants' argument. In this context, while still present, the Court's concerns are less acute.

Similarly, as noted above, *Lowther* involved allegations of sexual abuse. Because both cases concerned allegations of physical abuse and neither case concerned allegations of children living in filthy conditions, neither case is particularly relevant to the question of whether the conditions Daugherty observed provided arguable probable cause to arrest Mr. and Ms. Franco.

The more likely and better place to find cases interpreting a New Mexico statute is with the New Mexico state courts. *Cf. Cronick v. Pryor*, 99 F.4th 1262, 1271 (10th Cir. 2024) ("[I]n the context of an alleged false arrest for a purported state offense, state law is of inevitable importance. The basic federal constitutional right of freedom from arrest without probable cause is undoubtedly clearly established but the precise scope of that right uniquely depends on the contours of a state's substantive criminal law in this case because the officers claim to have had probable cause based on a state criminal statute. Thus, other than the statute itself the [state] Supreme Court is the ultimate authority." (cleaned up)). To determine what constitutes arguable probable cause to support an arrest under New Mexico's child abuse by endangerment statute, the Court therefore turns to the New Mexico Supreme Court for guidance.

First, the Court looks to *State v. Jensen*, where the New Mexico Supreme Court provided the following description of the home at issue:

> Before entering Defendant's home, several dogs had to be removed from inside. Chief Deputy Encinias testified as to the "totally horrible," "filthy," "nasty," and "terrible" conditions inside Defendant's home, which included dog feces and rodent droppings throughout the house. She also explained that an emu rushed at her upon opening a bedroom door in the house.
>
> On October 29, 2002, with Defendant's consent, Deputy Sheriff Milton Torrez searched Defendant's house. Deputy Sheriff Torrez testified that he had not seen a house "half as bad." In the living room area, there were dog feces, dog vomit on the floor, and rat and bird droppings in a cage. The entire kitchen area, including the stove, dishwasher, sink, and counter top, was dirty and littered with rodent droppings. The stove top burners, where Defendant cooked for Robbie, were also littered with rat droppings. The computer table that Robbie frequently used to surf the Internet was covered with trash and had rat or mouse droppings. Black rotten food was in the refrigerator next to some good hamburger meat. There was no

place to sit at the dining room table without coming into contact with the extremely dirty conditions. The baseboards looked as though dogs had urinated on them, and the dirty bathroom had empty coke bottles and a filthy looking plastic soda pop jug with a yellowish orange liquid in it. The entire house was littered with dust, papers, bottles, and animal waste that created a constant stench. In fact, an animal control officer who came to take Defendant's emu had to go outside to avoid vomiting from the smell.

*State v. Jensen*, 2006-NMSC-045, ¶¶ 4-5, 140 N.M. 416, 418-19, *abrogated by State v. Chavez*, 2009-NMSC-035, ¶¶ 4-5, 146 N.M. 434. These filthy conditions alone, however, were insufficient to support a conviction for child abuse by endangerment. As the *Jensen* court explained:

> [T]his case is not exclusively about filthy living conditions. The State argues that it was the combination of activities—providing the child with access to pornography and supplying alcohol to the child on a daily basis so the child could drink in excess while in a filthy environment—which prove child endangerment. As pointed out by the State, the child was in fact harmed when he became so intoxicated that he vomited. Yet Defendant continued to supply alcohol to the fifteen-year-old, assuring the child's daily intoxication. This was not a situation where an adult occasionally supplied alcohol to a child. The evidence was that for at least two weeks Defendant supplied the child with alcohol, knowing the child was drinking in excess.

*Jensen*, 2006-NMSC-045, ¶ 15. Three years after deciding *Jensen*, the New Mexico Supreme Court reiterated that filthy conditions, standing alone, were insufficient to support a conviction under New Mexico's child abuse by endangerment statute. Reflecting on *Jensen*, the court noted: "[T]he endangerment charge [in *Jensen*] was not premised exclusively on filthy conditions, but rather on a combination of risks including the criminal acts of supplying alcohol to a minor, allowing him to drink in excess to the point of sickness every night for two weeks, and allowing him to view pornography and smoke cigarettes, all within the filthy environment." *State v. Chavez*, 2009-NMSC-035, ¶ 30.

Unlike in *Jensen*, the child abuse by endangerment conviction at issue in *Chavez* was predicated solely on filthy living conditions, which were as follows:

the presence of rodent droppings in various places in the house, such as the cabinets where the dishes were stored and in Shelby's makeshift drawer bed. The home had no gas utility or hot water because the propane tank was empty and disconnected. Dirty clothes were scattered throughout the house; a strong-smelling bag of dirty diapers was left on the floor in the master bedroom next to the drawer bed, and there was a bowl of curdled milk on the floor in the kitchen. Outside, the yard contained a trash pit rife with flies and a pungent odor.

The home was also in need of repair and maintenance. The ceiling tiles were stained and starting to grow mold, evidencing a water leak, and one area of the ceiling in the living room appeared ready to collapse. The smoke detector had been disabled and was without a battery. The shower leaked and appeared to have mold, and a razor was left out in the bathroom where it might have been accessible to the children. Outside the home, where the children would run around barefoot and in diapers, there were glass shards from a broken window and a collapsed shed that contained exposed, rusty nails sticking out of lumber on the ground. The ramp leading to the front door of the mobile home contained a gap of several inches. There were also open cans of solvents or cleaners on the porch.

*Chavez*, 2009-NMSC-035, ¶¶ 6-7. The New Mexico Supreme Court acknowledged "that these conditions evidence poverty, filth, and neglect, and that they create some degree of risk, particularly for young children." *Id.* ¶ 35. Nonetheless, it held that the convictions of the parents who kept their children in such conditions must be vacated. The New Mexico Supreme Court explained:

The problem with the present case and this record is the lack of any specific evidence connecting these conditions to a substantial and foreseeable risk of harm. Any dirty house can lead to illness or injury, but the critical difference that distinguishes a filthy house from conditions that are criminal is whether those conditions present a truly consequential and foreseeable threat of harm to children. The risk of a cut or a bruise is not the same as the risk of a virulent disease. Our endangerment jurisprudence, as illustrated by *Jensen,* indicates that most of the hazards present in Defendant's home do not present the sort of serious risk anticipated by our Legislature, at least in the absence of specific evidence to the contrary.

Of course, the risk of disease and parasites presents a potentially more serious threat of harm. The State presented several witnesses to testify about the extent of the rodent infestation and the prevalence of rodent droppings throughout the home. Although mice are commonly associated with disease, not every exposure to rodents will result in serious illness. Therefore, the presence of mice in a home is not enough on its own to conclude that the children are at risk of contracting a serious illness.

. . . .

Evidence of diffuse hazards and a general lack of supervision is insufficient to establish that the children faced specific and identifiable harm in violation of the endangerment statute. Without additional evidence, the risk of harm was only speculative, indicating that Defendant's conviction was based on the condition of his home rather than the specific dangers arising therefrom.

*Id.* ¶¶ 37-38, 43.

Compare the filthy living conditions in *Jensen* and *Chavez* to those in the present case, which Defendants describe as follows: chickens and ducks wandering where children are sleeping; living quarters that contain feces; feces on the children's feet; raw sewage on the property; and exposed wiring where the children sleep and play. Doc. 43 at 17. Such filth is not as severe as the filth described in *Jensen* and *Chavez*. Animal feces are relevant, but even when combined with other filthy conditions they may not justify an arrest under the child abuse by endangerment statute. *Chavez*, 2009-NMSC-035, ¶ 38. As for Defendants' reference to raw sewage, there are no facts indicating that Daugherty observed the raw sewage, or that Crosby told him about it. Nor are there any facts indicating that raw sewage was present in the structure where the children were located or otherwise linking this condition to a specific and identifiable present danger to the children. Given that the filthy conditions in *Jensen* and *Chavez* were alone insufficient to support a conviction under New Mexico's child abuse by endangerment statute, the less-filthy conditions in the present case about which Daugherty knew do not provide arguable probable cause to charge the Francos under this same statute.

Defendants' argument related to a risk of electrocution is different than their argument about filthy living conditions. In determining whether a parent's conduct created a substantial and foreseeable risk of harm for purposes of New Mexico's child abuse by endangerment statute, one important consideration is the gravity of the threatened harm. *Chavez*, 2009-NMSC-035, ¶ 23. Defendants argue that the existence of "exposed wiring where the children sleep, play and

hang gaming controllers" supports the child abuse by endangerment charges against the Francos. Doc. 43 at 17. Defendants present no evidence about the gravity of harm—the degree to which a child shocked by the exposed wires in the structure would likely be harmed. *See Chavez*, 2009-NMSC-035, ¶ 38 (where the gravity of the harm is not apparent, some evidence of the gravity must exist to support a child abuse by endangerment charge). Nonetheless, evidence that a parent allowed young children to hang their game consoles from a structure's exposed live electrical wires, coupled with evidence that a reasonable officer could have believed the amount of current running through the wires might cause serious injury upon contact, would be sufficiently apparent to provide arguable probable cause for a child abuse by endangerment charge.

Defendants, however, do not allege that Daugherty himself was aware that game consoles were hanging from bare wires at the time he arrested the Francos. They allege that Crosby noticed game consoles hanging from bare wire but do not allege that Crosby conveyed this information to Daugherty before Daugherty arrested the Francos. *See* Doc. 43 at 8 ¶ 54 (citing Crosby's deposition in support of the following statement: "There were light switches with exposed wire and there was a video game controller hanging from it, which caused *Crosby* to be concerned for the kids shocking themselves." (emphasis added)).

The risk of shock Daugherty testified to, while concerning, was not as alarming:

Q. You note there was exposed electrical conduit. Can you tell me what that is, "electrical conduit"?

A. If I remember correctly, it would – it means that there is something like an outlet or a junction box somewhere where the wiring isn't covered. Or like there is – there is a risk of getting shocked.

Q. So, it was more than just a face plate not being put on an outlet; is that fair or is–

A. I don't remember. Like, I documented it just to note–

Q. Okay.

> A. –like, hey, there was something that – about the electrical that – that appeared to be unsafe.

Doc. 43-6 at 6-7. Not only does this testimony fail to discuss game consoles hanging from live wires, the evidence also indicates that Daugherty knew the exposed wires were not live.

During Daugherty's deposition, Plaintiffs' counsel pointed out that Daugherty had noted that electrical devices in the children's rooms were being powered by an extension cord. Doc. 43-6 at 7. The discussion proceeded as follows:

> Q. Okay. "Electrical devices in the children's room were being powered by an extension cord." You say that in your report, correct?
>
> A. Yes.
>
> Q. And what's the problem with that?
>
> A. It's an indication that the building that they are in doesn't have a correct power supply.
>
> Q. Okay. All right. So, there was no safety, like a shock concern to that, it's just that there is no power supply in the building?
>
> A. No, it's – it's not an appropriate way to -- and, again, we are talking in this -- it is a big deal in this one.

Doc. 48-14 at 5 (Daugherty dep. at 52:7-19). Daugherty's answer of "no" to the last question is ambiguous. Daugherty could have meant either "I agree that there was no safety concern" or "no, I did have a safety concern." Drawing all inferences in favor of the Plaintiffs, the Court resolves this ambiguity in favor of Plaintiffs and for purposes of the present motion and concludes that Daugherty did not believe the exposed wires presented a substantial risk of serious harm to the children.[24] Thus, although Daugherty testified that he believed the conditions in the structure created a shock risk, his testimony does not support the notion that the children in the structure

---

[24] Defendants present no evidence that the exposed wires actually had live electricity. Accordingly, the Court focuses on what Daugherty might have reasonably believed when he arrested the Francos.

faced a risk of electrocution so foreseeable and substantial as to support charges against their parents for child abuse by endangerment.

Under the New Mexico Supreme Court's interpretation of New Mexico's child abuse by endangerment statute, Daugherty lacked arguable probable cause to arrest the Francos for this crime. Because it is clearly established in the Tenth Circuit that a warrantless arrest without arguable probable cause is unconstitutional, Daugherty is not entitled to qualified immunity in connection with his arrest of the Francos for child abuse by endangerment.

H.    Separation of parents and order to stop talking

Defendants move for summary judgment on the claims in the complaint based on "the separation of the parents and [the] request from Daugherty to 'stop talking.'" Doc. 43 at 16. Defendants cite *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir 1997), in support of their argument that these acts do "not amount to an unconstitutional detention" because "Daugherty was trying to conduct a child welfare investigation." Doc. 43 at 16. *Gallegos* authorizes police to take "reasonable steps" to preserve the status quo during an investigatory stop supported by reasonable suspicion. 114 F.3d at 1030. To the extent Daugherty (1) took minimal steps to ensure safety and preserve the status quo while he was conducting an investigation (2) received information providing reasonable suspicion of a child welfare-related crime (3) in an area he was lawfully authorized to be without a warrant (outside the gate by the street), the instructions at issue were reasonable steps rather than unlawful seizures.

By raising this argument, Defendants shifted the burden to Plaintiffs to satisfy both prongs of the qualified immunity test. *Cox v. Glanz*, 800 F.3d 1231, 1245-46 (10th Cir. 2015). Plaintiffs, in turn, failed to address either of these alleged seizures in their response, thus failing to satisfy their burden on either prong of qualified immunity. The Court therefore grants qualified immunity on the claims in paragraphs 36(a) and (c) of the complaint.

I.    Right to Association

Count III of the complaint brings a First Amendment violation and alleges that "Defendant Daugherty intentionally interfered with this familial relationship by arresting the parents of the minor children without probable cause and placing the children in the custody of CYFD." Compl. ¶ 55. Plaintiffs make no arguments in support of this count in their response and, for the reasons Defendants set forth in their motion (Doc. 43 at 18), the Court finds Defendants are entitled to summary judgment.

To bring a claim for violation of the freedom of intimate association under section 1983, Plaintiffs must demonstrate an "intent to interfere with a particular relationship protected by the freedom of intimate association." *Trujillo v. Bd. of Cnty. Comm. of the Cnty. of Santa Fe*, 768 F.2d 1186, 1190 (10th Cir. 1985); *see also Bryson v. City of Edmond*, 905 F.2d 1386, 1394 (10th Cir. 1990) ("Nowhere in the complaint is there an allegation that any claimed acts or omissions, however intentional, occurred with the specific intent on the part of the defendants to deprive the plaintiffs of their rights of association with the victims."). As the Tenth Circuit has explained, "Not every statement or act that results in an interference with the rights of intimate association is actionable." *Griffin v. Strong*, 983 F.2d 1544, 1548 (10th Cir. 1993). "Rather, to rise to the level of a constitutional claim, the defendant must direct his or her statements or conduct at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship." *Id*.

There are no facts in this record based on which a reasonable jury could find that Daugherty directed his actions at the Plaintiffs' familial relationships. Nor do Plaintiffs cite any clearly established law that would put a reasonable officer on notice that his conduct would violate the First Amendment. Rather, the Tenth Circuit has held that separating spouses, conducting interviews with each spouse, and even lying to one spouse about the other spouse's

statements does not violate the Constitution. *Griffin v. Strong*, 983 F.2d 1544, 1548-49 (10th Cir. 1993) (voluntary interviews with both parties is only a "slight" infringement and "there is no evidence or allegation that the conduct going to Dorothy Griffin's familial rights of association claims involved physical coercion or conduct that shocks the conscience."). A reasonable officer could infer that an investigation into child welfare conditions—especially one that does not involve making any false statements—is likewise not violative of the right to intimate association. Therefore, the Court grants qualified immunity to Defendants on Count III.

## **CONCLUSION**

The Court grants Defendants' motion insofar as it requests qualified immunity for the following Defendants on the following claims:

- Defendants Daugherty, Crosby, Skinner, and Barnes on the claim that Defendants temporarily seized Ms. Franco by ordering that she needed to stay outside and could not go back into the trailer;

- Defendants Daugherty, Crosby, Skinner, and Barnes on the claim based on the first search (the safety sweep) of the Plaintiffs' trailer performed by Defendant Sanchez;

- All Defendants on the claim of a seizure effected by a display of firearms;

- Defendants Barnes and Skinner on the claim relating to Daugherty's search of the property;

- All Defendants on the claim for a seizure based on the separation of the parents and the request from Daugherty to stop talking;

- All Defendants on Count III of the complaint (First Amendment violation).

The remainder of the motion is denied.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE